**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| RENEE MARIE BROOKS, MIA FOTI, CYNTHIA KEHR, BARBARA SILLIMAN-GUYER, and JOHN WELTZ, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ALLEGHENY HEALTH NETWORK and INTRASYSTEMS, LLC,<br><br>Defendants. | Case No.: 2:25-cv-00125-NR<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs Renee Marie Brooks, Mia Foti, Cynthia Kehr, Barbara Silliman-Guyer, and John Weltz ("Plaintiffs"), by and through their undersigned counsel, hereby bring this Class Action Complaint on behalf of themselves and all other similarly situated persons ("Class Members") against Defendants Allegheny Health Network ("AHN") and IntraSystems, LLC ("IntraSystems") (collectively, "Defendants"), alleging as follows.

## NATURE OF THE ACTION

1. Plaintiffs bring this action against Defendants for their failure to properly secure and safeguard individuals' highly valuable personally identifiable information ("PII") and protected health information ("PHI") including, *inter alia*, individuals' names, dates of birth, addresses, Social Security numbers ("SSNs"), financial account numbers, health insurance identification numbers and other health insurance information, and treatment information

(including diagnoses, provider information, treatments/procedures, date(s) of service, and prescription information).[1]

2. Businesses that are entrusted with handling PII and PHI owe a non-delegable duty to the individuals to whom that data relates. This duty arises because, among other reasons, it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3. The harm resulting from a data breach manifests in a number of ways, including identity theft and financial or medical fraud. The exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take additional prophylactic measures.

4. Defendant AHN is a local health network that offers a broad spectrum of care and services. It has 14 hospitals and more than 200 primary and specialty care practices at over 300 clinical locations and offices. In addition, AHN has approximately 2,600 physicians in every clinical specialty, 21,000 employees, and thousands of volunteers. [2]

5. Defendant IntraSystems is an IT consulting company, managed services provider, and systems integrator that specializes in the deployment, management, and delivery of IT

[1] *Notice of Data Breach*, https://www.mass.gov/doc/2025-97-allegheny-health-network/download (last visited May 5, 2025).
[2] *Who We Are*, AHN, https://www.ahn.org/about/who-we-are (last visited May 6, 2025).

infrastructure, managed services, help desk services, cybersecurity services and assessments, virtualization services, security, and cloud solutions.[3]

6. IntraSystems was identified and selected by AHN to host, manage, and secure certain computer systems used by AHN's subsidiary Home Medical Equipment and Home Infusion companies.[4]

7. In connection with providing medical or other services, Defendants are provided with individuals' PII and PHI. As Defendants are or should have been aware, these types of personal and sensitive data are highly targeted by hackers who seek to exploit that data for nefarious purposes. This sensitive data can easily be misused to cause significant harm to Class Members.

8. By collecting and storing individuals' PII and PHI, Defendants assumed a resulting duty to secure, maintain, protect, and safeguard the PII and PHI with which they were entrusted against unauthorized access and disclosure through adequate security measures. Defendants are also aware that PII and PHI are highly valuable to cybercriminals, making it foreseeable that Defendants would be the target of a cyberattack.

9. Despite Defendants' duty to safeguard the PII and PHI with which they were entrusted, and the foreseeability of a data breach, Plaintiffs' and Class Members' sensitive information stored by Defendants was accessed by an unauthorized hacker when IntraSystems experienced a cybersecurity incident beginning on October 11, 2024. The incident was not discovered until on or around November 19, 2024, and it resulted in the unauthorized access of

---

[3] *About IntraSystems*, IntraSystems, https://intrasystems.com/about-intrasystems/ (last visited May 6, 2025).

[4] *Press Release*, AHN (Jan. 17, 2025), https://www.ahn.org/newsroom/press-releases/press-release?pr=ahn-it-vender-notifies-patients-of-home-medical-equipment-and-home-infusion-companies-about-cyber-security-incident.

IntraSystems's computer systems that were used to host, manage, and secure certain computer systems that support AHN's subsidiary companies (the "Data Breach").[5] The Data Breach resulted in the unauthorized access of the PII and PHI of nearly 300,000 individuals.[6]

10. As a direct and proximate result of Defendants' failure to implement and follow basic, standard security procedures, Plaintiffs' and Class Members' PII and PHI have been compromised by cybercriminals and disclosed to unauthorized persons. Upon information and belief, the compromised data included highly sensitive photographs of one or more patients who were unclothed while receiving medical care for burn injuries.

11. To make matters worse, Plaintiffs have confirmed that the information stolen by the hacker in the Data Breach is on the dark web. On or around February 27, 2025, a hacking group known as LockBit3.0 disseminated a post soliciting the sale of it with the title "Leaked Data." Among other things, this post stated that "[b]elow you can find some screenshots just as an illustration of the type of Data that was downloaded." A copy of this post is attached hereto as Exhibit A.

12. Plaintiffs and Class Members have suffered harm and remain at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal activity—risks which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

---

[5] *Id.*

[6] Kris. B. Mamula, *Data breach hits home care patients at Allegheny Health Network*, Pittsburgh Post-Gazette (updated Jan. 22, 2025), https://www.post-gazette.com/business/healthcare-business/2025/01/21/data-breach-home-care-patients-allegheny-health-network/stories/202501210060.

13. Plaintiffs, on behalf of themselves and the putative Class defined below, bring claims against both Defendants for negligence, unjust enrichment, and breach of contract to which Plaintiffs and Class Members were intended third party beneficiaries, declaratory judgment and, as to Defendant AHN only, breach of implied contract and breach of fiduciary duty. Plaintiffs seek damages, with attorneys' fees, costs, and expenses, and appropriate injunctive and declaratory relief.

14. To redress these harms, Plaintiffs and the Class seek damages in an amount to be determined at trial, declaratory judgment, and injunctive relief, and other appropriate relief available.

## PARTIES

15. Plaintiff Renee Marie Brooks is an adult who, at all relevant times, is and was a citizen of the Commonwealth of Pennsylvania.

16. Plaintiff Mia Foti is an adult who, at all relevant times, is and was a citizen of the Commonwealth of Massachusetts.

17. Plaintiff Cynthia Kehr is an adult who, at all relevant times, is and was a citizen of the Commonwealth of Pennsylvania.

18. Plaintiff Barbara Silliman-Guyer is an adult who, at all relevant times, is and was a citizen of the Commonwealth of Pennsylvania.

19. Plaintiff John Weltz is an adult who, at all relevant times, is and was a citizen of the Commonwealth of Pennsylvania.

20. Defendant Allegheny Health Network is a Pennsylvania nonprofit corporation with a principal place of business located at 120 Fifth Avenue, Suite 2900, Pittsburgh, PA 15222.

21. Defendant IntraSystems, LLC is a Massachusetts limited liability company with headquarters located at 35 Braintree Hill Office Park, Suite 403, Braintree, MA 02184.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendants, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

23. This Court has personal jurisdiction over Defendant Allegheny Health Network because its principal place of business is in the Commonwealth of Pennsylvania and is located within this judicial district.

24. This Court has personal jurisdiction over Defendant IntraSystems because, *inter alia*, it engaged in substantial business activities in Pennsylvania by maintaining an office in Pittsburgh and by contracting with AHN, a Pennsylvania-incorporated company, and by receiving and storing the information compromised in the Data Breach for AHN.

25. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) as Defendant AHN resides in this District; and a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL BACKGROUND

### A. Defendants Collected and Stored Plaintiffs' and Class Members' PII and PHI

26. As discussed above, Defendant AHN is a health network that offers a broad spectrum of care and services. AHN has approximately 2,600 physicians in every clinical specialty, 21,000 employees, and thousands of volunteers.[7]

[7] *Who We Are*, *supra* note 2.

27. Defendant IntraSystems is an IT consulting company, managed services provider, and systems integrator that specializes in the deployment, management, and delivery of IT infrastructure, managed services, help desk services, cybersecurity services and assessments, virtualization services, security, and cloud solutions.[8]

28. Upon information and belief, during the relevant time period, AHN utilized IntraSystems as its vendor to host, manage, and secure certain computer systems used by AHN's subsidiary Home Medical Equipment and Home Infusion companies.[9]

29. Both AHN and IntraSystems, during the regular course of administering services, receive, create, maintain, and handle patients' PII and PHI. This information includes, *inter alia*, individuals' names, dates of birth, address, SSNs, financial account numbers, health insurance identification numbers and other health insurance information, and treatment information including diagnoses, provider information, treatments/procedures, date(s) of service, prescription information, and medical device serial numbers.[10]

30. Plaintiffs and Class Members directly or indirectly entrusted Defendants with their sensitive and confidential PII and PHI and, therefore, reasonably expected that Defendants would safeguard their highly sensitive PII and keep their PHI confidential.

31. Due to the sensitivity of the PII and PHI that Defendants handle, collect, and store, they were aware of their critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

---

[8] *About IntraSystems*, *supra* note 3.

[9] Steve Alder, *294,000 Allegheny Health Network Patients Affected by Business Associate Cyberattack*, The HIPAA Journal (Jan. 23, 2025), https://www.hipaajournal.com/allegheny-health-network-ba-cyberattack/.

[10] *Notice of Data Breach*, *supra* note 1.

32. By requesting, obtaining, collecting, storing, and deriving benefits from Plaintiffs' and Class Members' PII and PHI, Defendants assumed equitable and legal duties to safeguard and keep confidential Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

33. AHN expressly recognizes this duty stating: "transparency is a key principle guiding our business decisions and the relationship with our customers. All the information we collect from or about our customers is maintained in accordance with a variety of state and federal laws and regulations, industry best practices, and our corporate standards."[11]

34. IntraSystems also expressly recognizes this duty, stating: "Trust IntraSystems when privacy, security, and reliability matter most,"[12] and further stating that "IntraSystems respects your privacy and is committed to protecting your personal information."[13]

35. Despite Defendants' representations and the existence of these duties, they each failed to implement reasonable data security measures to protect Plaintiffs' and Class Members' PII and PHI and ultimately allowed threat actors to compromise Plaintiffs' and Class Members' PII and PHI.

**B. The Risks of Storing Valuable PII and PHI Are Well Known in the Healthcare Industry**

36. Given their frequent handling of sensitive data, Defendants were aware at all relevant times that the PII and PHI that they obtain, collect, store, use, and derive a benefit from is highly sensitive and is of significant value to those who seek to use it for wrongful purposes.

---

[11] *Digital Privacy Policy - Highmark Health*, AHN (last revised Aug. 2023), https://www.ahn.org/about/privacy-policy.
[12] *Healthcare Services*, IntraSystems, https://intrasystems.com/it-healthcare/ (last visited May 6, 2025).
[13] *Privacy Policy*, IntraSystems (last updated Jan. 15, 2025), https://intrasystems.com/privacy-policy/.

37. Defendants also knew that a breach of their data systems, and the exposure of the information stored therein, would result in the imminent risk of identity theft and fraud for the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

38. These risks are not theoretical; in recent years, data breaches at healthcare companies have become ubiquitous, with a new breach seemingly announced every few days.[14] The slew of healthcare data breaches over the last few years has surely put Defendants on notice that their electronic records will be targeted by cybercriminals.

39. PII and PHI has considerable value and constitutes an enticing and well-known target for hackers. Hackers can easily sell stolen data, as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[15] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

40. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. In 2023, there were 6,077 recorded data breach incidents, exposing seventeen billion records. The United States specifically saw a 19.8% year-over-year increase in data breaches as compared to 2022.[16]

---

[14] *See generally* Steve Alder, *Healthcare Data Breach Statistics*, HIPAA Journal, https://www.hipaajournal.com/healthcare-data-breach-statistics/ (Apr. 17, 2025).

[15] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[16] *2024 Global Threat Intelligence Report*, Flashpoint (Feb. 29, 2024), https://go.flashpoint.io/2024-global-threat-intelligence-report-download.

41. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[17]

42. The healthcare industry in particular has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[18] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[19]

43. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2024, 6,759 healthcare data breaches of 500 or more individuals have been reported to Health and Human Services' Office of Civil Rights. Those breaches have resulted in the exposure of 846,962,011 individuals, which equates to more than 2.6 times the population of the United States.[20]

44. In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights,

---

[17] *Insurance Information Institute, Facts & Statistics: Identity Theft and Cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime#Identity%20Theft%20And%20Fraud%20Reports,%202015-2019%20 (last visited May 6, 2025).

[18] *The Healthcare Industry is at Risk*, SwivelSecure https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited May 6, 2025).

[19] Steve Alder, Editorial: *Why Do Criminals Target Medical Records*, HIPAA Journal (Oct. 14, 2022), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

[20] *Supra* note 15.

beating the record of 720 healthcare security breaches set the previous year."[21] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[22]

45. "In 2024, the protected health information of 276,775,457 individuals was exposed or stolen. On average, that is 758,288 records per day[.]"[23]

46. The breadth of data compromised in the Data Breach here makes the information particularly valuable to cybercriminals and leaves Plaintiffs and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

47. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique SSNs cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to an individual, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

48. The Social Security Administration warns that the process of replacing a SSN is a difficult one that creates other problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.

[21] Steve Alder, *Security Breaches in Healthcare in 2023*, The HIPAA Journal (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[22] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA Today (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

[23] *Supra* note 15.

> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[24]

49. SSNs allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often SSNs can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes SSNs a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

50. **Healthcare Records**—As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[25] A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for about $1.[26]

51. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. Healthcare data can be used to impersonate patients to obtain expensive

---

[24] *Identify Theft and Your Social Security Numbers*, Social Security Admin. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

[25] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[26] *Managing Cyber Risks in an Interconnected World, Key Findings from The Global State of Information Security® Survey 2015*, PriceWaterhouseCoopers, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Feb. 24, 2025).

medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[27]

52. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts—far more than is usually possible with stolen credit card information."[28]

53. According to Experian:

> Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data [to] open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.
>
> ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.
>
> Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[29]

---

[27] *Security Breaches in Healthcare in 2023*, *supra* note 22.
[28] *Id.*
[29] Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

54. Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data, resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

55. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

56. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[30] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[31]

57. Based on the value of individuals' PII and PHI to cybercriminals, and the foreseeability of a data breach, Defendants knew or should have known the importance of

---

[30] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Mar. 3, 2024), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.
[31] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

safeguarding the PII and PHI entrusted to them and of the foreseeable consequences that would arise if its data security systems were breached. Defendants failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

### C. Defendants Breached Their Duties to Protect PII and PHI

58. As noted above, on January 17, 2025, AHN announced that its vendor IntraSystems experienced a cybersecurity incident that led to unauthorized access to computer systems that supported AHN's subsidiary Home Medical Equipment and Home Infusion companies.[32]

59. Despite discovering the Data Breach on November 19, 2024, Defendants waited approximately two months to announce that individuals' PII and PHI had been compromised.[33]

60. AHN did not begin notifying impacted individuals until January 17, 2025, when it posted a notice of the Data Breach through a press release,[34] and began to file notifications of the Data Breach with the requisite authorities.[35]

61. AHN describes the circumstances surrounding the Data Breach as follows:

> [A]n IT vendor – IntraSystems, LLC – responsible for hosting, managing, and securing certain computer systems that support AHN's subsidiary Home Medical Equipment and Home Infusion companies experienced a cyber security incident that led to unauthorized access to those computer systems beginning on Oct. 11, 2024. AHN learned about the cyber event on Nov. 19, 2024.[36]

62. At or around this time—two months after the Data Breach took place—AHN first announced the data breach and began to send notification letters to affected individuals.[37]

---

[32] *Press Release*, *supra* note 4.
[33] *Notice of Data Breach*, *supra* note 1.
[34] *Press Release, supra* note 4.
[35] *Notice of Data Breach*, *supra* note 1.
[36] *Press Release, supra* note 4.
[37] *294,000 Allegheny Health Network Patients Affected by Business Associate Cyberattack*, *supra* note 10.

63. AHN indicated that a wide variety of PII and PHI was compromised in the Data Breach, including, *inter alia*, individuals' names, dates of birth, addresses, SSNs, financial account numbers, health insurance identification numbers and other health insurance information, and treatment information including diagnoses, provider information, treatments/procedures, date(s) of service, prescription information, and medical device serial numbers.[38]

64. According to reports, the PII and PHI of 294,000 individuals were affected by the Data Breach.[39]

65. Based on AHN's own statements, cybercriminals intentionally accessed IntraSystems' computer systems in an attack designed to access Plaintiffs' and Class Members' valuable PII and PHI stored therein, and that these malicious actors were successful in the attack.[40]

66. As a direct and proximate result of Defendants' failure to implement and maintain adequate security measures, Plaintiffs' and Class Members' PII and PHI was exposed to unknown, malicious actors during the Data Breach. It will be nearly impossible for Plaintiffs and the Class to ensure that their stolen PII and PHI have been secured and not further disseminated.

**D. Defendants Failed to Comply with FTC Guidelines**

67. Defendants are prohibited by the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45 from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission ("FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act.

[38] *Notice of Data Breach*, *supra* note 1.
[39] *294,000 Allegheny Health Network Patients Affected by Business Associate Cyberattack*, *supra* note 10.
[40] *Press Release, supra* note 4.

68. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[41]

69. In 2016, the FTC updated its publication titled "Protecting Personal Information: A Guide for Business," which established cyber-security guidelines for businesses.[42] The guidelines recommend that businesses implement the following:

a. Businesses should promptly dispose of personal identifiable information that is no longer needed, and retain sensitive data "only as long as you have a business reason to have it;"

b. Businesses should encrypt sensitive personal information stored on computer networks so that it is unreadable even if hackers are able to gain access to the information;

c. Businesses should thoroughly understand the types of vulnerabilities on their network and how to address those vulnerabilities;

d. Businesses should install intrusion detection systems to promptly expose security breaches when they occur; and

e. Businesses should install monitoring mechanisms to watch for large troves of data being transmitted from their systems.[43]

---

[41] *See* Federal Trade Commission, *Start with Security: A Guide for Business* (June 2015), available at: https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.

[42] *See* Federal Trade Commission, *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (Oct. 2016), available at: https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[43] *Id.*

70. In another publication, the FTC recommended that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[44]

71. Notably, the FTC treats the failure to employ reasonable data security safeguards as an unfair act or practice prohibited by Section 5 of the FTC Act. Indeed, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

72. Upon information and belief, Defendants failed to properly implement one or more of the basic data security practices recommended by the FTC. Defendants' failure to employ reasonable and appropriate data security measures to protect against unauthorized access to individuals' PII and PHI constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

73. Similarly, the U.S. Government's National Institute of Standards and Technology ("NIST") provides a comprehensive cybersecurity framework that companies of any size can use to evaluate and improve their information security controls.[45]

---

[44] *See Start with Security: A Guide for Business*, Federal Trade Commission (June 2015), available at https://www.ftc.gov/tips-advice/business-center/guidance/start-security-guide-business.
[45] *See Framework for Improving Critical Infrastructure Cybersecurity*, National Institute of Standards & Technology (Apr. 16, 2018), App'x A, Table 2, available at https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

74. NIST publications include substantive recommendations and procedural guidance pertaining to a broad set of cybersecurity topics including risk assessments, risk management strategies, access controls, training, data security controls, network monitoring, breach detection, and incident response.[46] Upon information and belief, Defendants failed to adhere to the NIST guidance.

75. Further, cybersecurity experts have identified various best practices that should be implemented by entities in the healthcare sector, including implementing the following measures to defend against common cyberattacks:

a. Email protection systems and controls;

b. Endpoint protection systems;

c. Identify all users and audit their access to data, application, systems, and endpoints;

d. Data protection and loss prevention measures;

e. IT asset management;

f. Network management;

g. Vulnerability management;

h. Security operations center & incident response; and

i. Cybersecurity oversight and governance policies, procedures, and processes.[47]

---

[46] *Id.* at Table 2, 26–43.
[47] *HICP's 10 Mitigating Practices*, HHS, https://405d.hhs.gov/best-practices (last visited May 6, 2025).

76. Upon information and belief, Defendants' failure to protect massive amounts of PII and PHI is a result of its failure to adopt reasonable safeguards as required by the FTC guidelines, NIST guidance, and industry best practices.

77. Defendants were aware of their obligations to use reasonable measures to protect individuals' PII and PHI. Defendants also knew they were targets for hackers, as discussed above. Despite understanding the risks and consequences of maintaining inadequate data security, Defendants nevertheless failed to comply with their data security obligations, leading to the compromise of Plaintiffs' and Class Members' PII and PHI.

**E. Plaintiffs and Class Members Suffered Damages**

78. For the reasons mentioned above, Defendants' conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and members of the Class have already been caused to and must continue to devote time, energy, and money to: (1) closely monitoring their medical statements, bills, records, and credit and financial accounts; (2) changing login and password information on any sensitive account even more frequently than they already do; (3) more carefully screening and scrutinizing phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) searching for suitable identity theft protection and credit monitoring services, and paying to procure them.

79. Through the investigation of Plaintiffs and their counsel, Plaintiffs have determined that their PII and PHI have already been advertised on the dark web. A search revealed that credentials exfiltrated from AHN's systems were posted for ransom by a hacker called LockBit3.0 on February 27, 2024. *See* Exhibit A.

80. As of May 2025, the PII and PHI of AHN's patients are still available on LockBit3.0's forum. Furthermore, through the investigation of counsel, Plaintiffs have determined that multiple images are included in the exfiltrated AHN data set. Anyone who can access the dark web can download Plaintiffs' and Class Members' PII and PHI, including sensitive photographs.

81. Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendants' conduct. Further, the value of Plaintiffs' and Class Members' PII and PHI has been greatly diminished by its exposure in the Data Breach.

82. As a result of Defendants' failures, Plaintiffs and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes following the Data Breach. Those who are affected experience heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

83. With respect to data breaches specifically in the healthcare sector, a study has found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[48]

84. "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[49]

---

[48] Jessica David, *70% of Data Involved in Healthcare Breaches Increases Risk of Fraud*, Health IT Sec. (Sept. 25, 2019), https://healthitsecurity.com/news/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud.

[49] *Id*.

85. The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[50]

86. Health information in particular is likely to be used in detrimental ways. Cybercriminals can leverage sensitive personal health details and diagnoses to extort or coerce the victim and commit serious and long-term identity theft.[51]

87. "Medical identity theft is a great concern not only because of its rapid growth rate, but because it is the most expensive and time consuming to resolve of all types of identity theft. Additionally, medical identity theft is very difficult to detect which makes this form of fraud extremely dangerous."[52]

88. Indeed, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[53]

89. Plaintiffs and Class Members are at continued risk because their information remains in Defendants' systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendants fail to undertake the necessary and appropriate security and training measures to protect the PII and PHI with which they were entrusted.

---

[50] Andrew Steger, *What Happens to Stolen Healthcare Data?*, HealthTech (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon.
[51] *Id*.
[52] *The Potential Damages & Consequences of Medical Identity Theft & Healthcare Data Breaches*, Experian (Apr. 2010), https://www.experian.com/assets/data-breach/white-papers/consequences-medical-id-theft-healthcare.pdf.
[53] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

90. Additionally, Plaintiffs and Class Members have suffered emotional distress, increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers as a result of the Data Breach.

**F. Plaintiffs' Experiences**

***Plaintiff Renee Marie Brooks***

91. Plaintiff Renee Marie Brooks is a former patient of AHN. She provided her PII and PHI directly to AHN to receive healthcare services.

92. Ms. Brooks provided her PII and PHI to Defendants through the online patient portal and written forms at her healthcare provider's office.

93. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Ms. Brooks's PII and PHI, Defendants undertook a duty to act reasonably in its handling of Plaintiffs' PII and PHI. Defendants, however, did not take reasonable care of Ms. Brooks's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

94. On or around January 2025, Ms. Brooks received notice from AHN that her PII and PHI was implicated in the Data Breach.

95. Ms. Brooks is extremely careful with her private information. She stores her important personal documents in a safe and uses a designated credit card for online shopping because she is wary of online merchants having her debit card information.

96. Since receiving the notice, Ms. Brooks has been required to spend her valuable time and effort attempting to mitigate the harm caused by the Data Breach. Fraudulent charges were made to her payment cards in December of 2024, totaling approximately $200–$300. As a result, Ms. Brooks had to cancel her payment cards and order new ones. Ms. Brooks has activated bank alerts for all charges made on her payment cards. She has also experienced a dramatic increase in

spam calls and texts. In all, she has spent at least 20 hours dealing with the concerns and harm caused by the Data Breach.

97. As a direct and proximate result of the Data Breach, Ms. Brooks has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) fraudulent charges to her payment cards; (b) efforts to mitigate the risk of misuse of her PII and PHI; (c) damages to and diminution of the value of her PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (d) a loss of privacy.

98. Further, knowing that hackers accessed and possibly exfiltrated her PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Ms. Brooks to experience stress, anxiety, worry, and fear.

99. As a direct and proximate result of the Data Breach, Ms. Brooks has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

***Plaintiff Mia Foti***

100. Plaintiff Mia Foti is a patient of AHN. She provided her PII and PHI directly to AHN to receive healthcare services.

101. Plaintiff Mia Foti was airlifted to West Penn Hospital (an AHN-affiliated facility) for emergency treatment. She spent two weeks in the ICU there. While in the hospital, AHN came into possession of photos of Ms. Foti while she was naked that were taken for the treatment of skin burns. She provided her PII and PHI to Defendants through a written form at her healthcare provider's office.

102. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Ms. Foti's PII and PHI, Defendants undertook a duty to act reasonably in its handling of Plaintiffs' PII and PHI. Defendants, however, did not take reasonable care of Ms. Foti's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

103. On or around January 2025, Ms. Foti received notice from AHN that her PII and PHI was implicated in the Data Breach.

104. When Ms. Foti contacted AHN and asked whether her treatment photos had been included in the Data Breach, an employee of AHN verbally confirmed that the photos were among the personal information compromised.

105. Since receiving notice of the Data Breach, Ms. Foti has been required to spend her valuable time and effort attempting to mitigate the harm caused by the Data Breach. Ms. Foti has placed a freeze on her credit accounts and has spent approximately an hour per week since learning of the Data Breach researching the breach, monitoring her financial accounts, and changing the passwords to her online accounts. Additionally, Ms. Foti has experienced an increase in spam calls and texts. In all, Ms. Foti has spent approximately ten hours dealing with the concerns and harm caused by the Data Breach.

106. Ms. Foti has also experienced anxiety and emotional distress knowing that cybercriminals have access to the nude photos taken for her burn treatment.

107. As a direct and proximate result of the Data Breach, Ms. Foti has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of her PII and PHI; and (b) damages to and diminution of the value of her PII and PHI, a form of intangible property that loses value when it falls into the

hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

108. Further, knowing that hackers accessed and possibly exfiltrated her PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Ms. Foti to experience stress, anxiety, worry, and fear.

109. As a direct and proximate result of the Data Breach, Ms. Foti has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

***Plaintiff Cynthia Kehr***

110. Plaintiff Cynthia Kehr is a patient of AHN. She provided her PII and PHI to Defendants to receive healthcare services. She provided her PII and PHI to Defendants in person by completing forms at her medical appointments, over the phone, and through AHN's patient app.

111. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Ms. Kehr's PII and PHI, Defendants undertook a duty to act reasonably in its handling of this information. Defendants, however, did not take reasonable care of Ms. Kehr's PII and PHI, leading to their exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

112. On or around January 17, 2025, Ms. Kehr received notice from AHN that her PII and PHI was implicated in the Data Breach.

113. Ms. Kehr is extremely careful with her private information. She only uses checks for withdrawing cash from ATMs, does not carry her Social Security card on her person, and does not share private information.

114. Since receiving notice of the Data Breach, Ms. Kehr has been required to spend her valuable time and effort attempting to mitigate the harm caused by it. Ms. Kehr has placed a freeze on her credit accounts, has spent approximately an hour per week since learning of the Data Breach monitoring and documenting each transaction in her bank accounts in a spreadsheet, and has experienced an increase in spam calls and texts. Ms. Kehr would not have to undertake these time-intensive measures but for the Data Breach.

115. As a direct and proximate result of the Data Breach, Ms. Kehr has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of her PII and PHI; and (b) damages to and diminution of the value of her PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

116. Further, knowing that hackers accessed and possibly exfiltrated her PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Ms. Kehr to experience stress, anxiety, worry, and fear.

117. As a direct and proximate result of the Data Breach, Ms. Kehr has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

***Plaintiff Barbara Silliman-Guyer***

118. Plaintiff Barbara Silliman-Guyer is a patient of AHN. She provided her PII and PHI directly to Defendants to receive healthcare services. She provided her PII and PHI to Defendants in person to employees of AHN prior to her medical appointments.

119. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Ms. Silliman-Guyer's PII and PHI, Defendants undertook a duty to act reasonably in their handling of this sensitive information. Defendants, however, did not take reasonable care of Ms. Silliman-Guyer's PII and PHI, leading to its exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

120. In or around early February 2025, Ms. Silliman-Guyer received a letter from AHN stating that her PII and PHI was implicated in the Data Breach.

121. Ms. Silliman-Guyer is extremely careful with her private information. She does not give out any sensitive information about herself unless necessary, and even then, only to trusted recipient. Ms. Silliman-Guyer believed AHN to be one such trusted recipient.

122. Since receiving notice of the Data Breach, Ms. Silliman-Guyer has been required to spend her valuable time and effort attempting to mitigate the harm caused by the Data Breach. Ms. Silliman-Guyer has spent approximately an hour per week since she learned of the Data Breach researching the circumstances of the breach and monitoring for identity fraud. Since the Data Breach Ms. Sillman-Guyer has experienced an increase in spam calls and texts claiming to relate to Medicare, receiving up to four or five spam telephone calls per day. She is required to spend time each day answering and screening these calls. Ms. Silliman-Guyer would not have to undertake these time-intensive measures but for the Data Breach.

123. As a direct and proximate result of the Data Breach, Ms. Silliman-Guyer has suffered actual injury from having her PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of her PII and PHI; and (b) damages to and diminution of the value of her PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

124. Further, knowing that hackers accessed and possibly exfiltrated her PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Ms. Silliman-Guyer to experience stress, anxiety, worry, and fear.

125. As a direct and proximate result of the Data Breach, Ms. Silliman-Guyer has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and certainly impending and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

***Plaintiff John Weltz***

126. Plaintiff John Weltz is a patient of AHN. He provided his PII and PHI directly to Defendants to receive healthcare services. Mr. Weltz had no choice but to provide certain information to receive treatment when, approximately two and a half years ago, he went to AHN's emergency department with severe back pain. He required an immediate spinal fusion operation that resulted in a four-day hospital stay. Following Mr. Weltz's discharge from the hospital, he received in-home healthcare services through AHN's subsidiaries, Home Medical Equipment and Home Infusion.

127. In requesting, obtaining, collecting, storing, using, and deriving a benefit from Mr. Weltz's PII and PHI, Defendants undertook a duty to act reasonably in their handling of Mr. Weltz's PII and PHI. Defendants, however, did not take reasonable care of Mr. Weltz's PII and PHI, leading to its exposure and compromise as a direct and proximate result of Defendants' inadequate security measures.

128. On or around January 17, 2025, Mr. Weltz received notice from AHN that his PII and PHI was implicated in the Data Breach.

129. Mr. Weltz is extremely careful about his personal and medical information. He and his wife monitor and verify each transaction in their bank accounts and respond immediately if they do not recognize a charge. They do not bank by telephone or online and only receive paper copies of their bank statements. Mr. Weltz also does not pay utility bills online.

130. Since receiving notice of the Data Breach, Mr. Weltz has been required to spend his valuable time and effort researching the data breach. Mr. Weltz would not have to undertake these time-intensive measures but for the Data Breach.

131. As a direct and proximate result of the Data Breach, Mr. Weltz has suffered actual injury from having his PII and PHI exposed and/or stolen as a result of the Data Breach, including: (a) efforts to mitigate the risk of misuse of his PII and PHI; and (b) damages to and diminution of the value of his PII and PHI, a form of intangible property that loses value when it falls into the hands of criminals who are using that information for fraud or publishing the information for sale on the dark web; and (c) a loss of privacy.

132. Further, knowing that hackers accessed and possibly exfiltrated his PII and PHI, and that this information likely has been or will be used in the future for identity theft, fraud, and other nefarious purposes has caused Mr. Weltz to experience stress, anxiety, worry, and fear. Mr.

Weltz is particularly worried that cybercriminals will use his PII and PHI once the complimentary year of credit monitoring offered by AHN has passed.

133. As a direct and proximate result of the Data Breach, Mr. Weltz has been and will continue to be at a substantial and certainly impending risk for fraud and identity theft and its attendant damages for years to come. Such a risk is real and imminent and is not speculative given the highly sensitive nature of the PII and PHI compromised in the Data Breach.

## CLASS ALLEGATIONS

134. Plaintiffs bring this class action on behalf of themselves and all other similarly situated individuals pursuant to Fed. R. Civ. P. 23.

135. Plaintiffs seek to represent a Nationwide Class of persons to be defined as follows:

**Nationwide Class**

All individuals who are residents of the United States whose PII and/or PHI were compromised in the Data Breach, including all persons who received notice of the Data Breach.

136. In the alternative to the Nationwide Class, Plaintiffs seek to represent the following State Classes:

**Pennsylvania Class**

All individuals who are residents of Pennsylvania whose PII and/or PHI were compromised in the Data Breach, including all persons who received notice of the Data Breach.

**Massachusetts Class**

All individuals who are residents of Massachusetts whose PII and/or PHI were compromised in the Data Breach, including all persons who received notice of the Data Breach.

137. Excluded from the Nationwide Class and the Pennsylvania and Massachusetts Classes (the "Classes") are Defendants, their subsidiaries and affiliates, officers and directors, any entity in which Defendants have a controlling interest, the legal representative, heirs, successors,

or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

138. The proposed class definitions are based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when they move for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

139. **Numerosity:** The members of the Classes are so numerous that the joinder of all members is impractical. The exact size of the Class and the identities of the individual members are identifiable through Defendants' records, including but not limited to the files implicated in the Data Breach. Based on the public information currently available, the Nationwide Class includes approximately 294,000 individuals. Class Members are ascertainable. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendants' books and records.

140. **Commonality:** This action involved questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether and to what extent Defendants had a duty to protect the PII and PHI of Plaintiffs and Class Members;

b. Whether Defendants were negligent in collecting and storing Plaintiffs' and Class Members' PII and PHI, and breached their duties thereby;

c. Whether Defendants took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII and PHI;

d. Whether Defendants failed to adequately safeguard Plaintiffs' and Class Members' PII and PHI;

e. Whether Defendants breached their duty to exercise reasonable care in handling Plaintiffs' and Class Members' PII and PHI;

f. Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Plaintiffs and Class Members are entitled to damages as a result of Defendants' wrongful conduct; and

h. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

141. **Typicality:** Plaintiffs' claims are typical of the claims of Class Members. Plaintiffs' and Class Members' claims are based on the same legal theories and arise from the same unlawful and willful conduct. Plaintiffs and Class Members each had their PII and PHI exposed and/or accessed by an unauthorized third party.

142. **Adequacy:** Plaintiffs are adequate representatives of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the Class Members and have no interests antagonistic to the Class Members. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical, as explained above.

143. **Superiority:** This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all Class Members is impracticable. This proposed class action presents fewer management difficulties than individual litigation, and provides the benefits of single

adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and promote uniform decision-making.

144. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages are common to Plaintiffs and each member of the Class. If Defendants breached their duty to Plaintiffs and Class Members, then Plaintiffs and each Class member suffered damages by that conduct.

145. Defendants have acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## FIRST CAUSE OF ACTION
## NEGLIGENCE
## (On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Pennsylvania and Massachusetts Classes Against Defendants AHN and IntraSystems)

146. Plaintiffs restate and reallege the allegations set forth in paragraphs 1–145 as if fully set forth herein.

147. Defendants owed a non-delegable duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiffs and the Class in Defendants' possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

148. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendants' security systems to ensure that Plaintiffs' and Class Members' PII and PHI in Defendants' possession was adequately secured and protected; (b) implementing processes

that would detect a breach of their security systems in a timely manner; (c) timely acting upon warnings and alerts, including those generated by their own security systems, regarding intrusions to their networks; and (d) maintaining data security measures consistent with industry standards.

149. Defendants' duty to use reasonable care arose from several sources, including but not limited to those identified below.

150. Defendants had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendants. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendants were obligated to act with reasonable care to protect against these foreseeable threats. Defendants alone controlled their technology, infrastructure, and cybersecurity. Defendants further knew or should have known that if hackers breached their data systems, they would extract sensitive data and inflict injury upon Plaintiffs and Class Members. Furthermore, Defendants knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiffs and Class Members, was the foreseeable consequence of Defendants' unsecure, unreasonable data security measures.

151. Defendants also owed a common law duty because their conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendants' conduct included their failure to adequately restrict access to their computer networks that held Plaintiffs' and Class Members' PII and PHI.

152. Defendants' duty also arose from their position as a healthcare business associate and covered entity. Defendants hold themselves out as a trusted business associate and a trusted provider of healthcare services, thereby assuming a duty to reasonably protect the information they obtain from their patients and customers. Indeed, Defendants, which receive, maintain, and handle the PII and PHI with which they were entrusted, were in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

153. Defendants are subject to an "independent duty," untethered to any contract between Defendants and Plaintiffs and Defendants and Class Members. The sources of Defendants' duty are identified above.

154. Defendants breached the duties owed to Plaintiffs and Class Members and thus were negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiffs at this time, on information and belief, Defendants breached their duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees and third party vendors with access or credentials to systems and databases containing sensitive PII and PHI.

155. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiffs and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

156. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have suffered injuries including:

a. Theft of their PII and PHI;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h. Damages to and diminution in value of their PII and PHI entrusted to Defendants with the mutual understanding that Defendants would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendants' possession and is subject to further breaches so long as Defendants fail to undertake appropriate and adequate measures to protect Plaintiffs and Class Members.

157. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

158. In addition to their common law obligations, Defendants owed a duty to Plaintiffs and the Class under the FTC Act, 15 U.S.C. § 45(a)(1). Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendants or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendants' duty.

159. Defendants violated Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with the industry standards. Defendants' conduct was particularly unreasonable given the nature and amount of PII and PHI they obtained and stored and the foreseeable consequences of a data breach involving the PII and PHI they obtained when servicing the healthcare needs of their patients and customers.

160. Plaintiffs and Class Members are within the class of persons that Section 5 of the FTC Act is intended to protect.

161. Moreover, the harm that has occurred is the type of harm that Section 5 of FTC Act was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses that caused the same harm suffered by Plaintiffs and Class Members as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices.

162. Defendants' violation of Section 5 of the FTC Act constitutes negligence.

163. As a direct and proximate result of Defendants' negligence, Plaintiff and Class Members have suffered injuries, including those identified above in paragraph 133.

164. As a direct and proximate result of Defendants' negligence, Plaintiffs and Class Members have been injured as described herein, and are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Nationwide Class or, alternatively, the Pennsylvania Class and Massachusetts Class, Against Defendant AHN)**

165. Plaintiffs restate and reallege the allegations set forth in paragraphs 1–145 as if fully set forth herein.

166. Plaintiffs and Class Members have an interest, both equitable and legal, in the PII and PHI that was conveyed to, collected by, and maintained by AHN and that was ultimately accessed or compromised in the Data Breach.

167. As a healthcare provider, AHN has a fiduciary relationship to its patients. By providing medical treatment and healthcare services for Plaintiffs and the Class, AHN has a duty to act in good faith and solely for the benefit of Plaintiffs and Class Members in all matters related to their healthcare.

168. AHN is in possession of individuals' PII, PHI, and confidential medical information that are not generally known. Plaintiffs are very careful with their PII and PHI and do not disclose their medical information of their own accord.

169. Plaintiffs and Class members neither consented to nor authorized the disclosure of their PHI to an unknown criminal actor.

170. Defendant AHN was negligent in the maintenance of its computer systems in which Plaintiffs' and Class Members' PII and PHI were stored. AHN knew, or should have known, that the private information stored in its systems could be exploited at great cost to Plaintiffs and the Class.

171. Plaintiffs have suffered concrete injuries as a result of their PII and PHI being exposed in the Data Breach.

172. Plaintiffs have dedicated significant time to monitoring their financial accounts, implementing credit freezes, registering for identity theft protection, and dealing with increased spam communications. All Plaintiffs have felt significant anxiety, particularly because it is public knowledge that the free credit monitoring available to victims of the Data Breach will only last for one year. As discussed *supra*, cybercriminals may store individuals' PII and PHI for years before using it for fraudulent activity. After AHN's offer of credit monitoring expires, any credit monitoring services that Plaintiffs require must be purchased out of pocket. Due to the breadth of private information compromised in the Data Breach, Plaintiffs may need credit monitoring services for the rest of their lives.

173. Beyond the impending risk of identity or medical fraud, Plaintiffs have suffered emotional distress from the exposure of their private medical information. By AHN's own admission, images of Plaintiff Foti's full-body burns were compromised in the Data Breach. The information and images Ms. Foti provided to AHN were for the purposes of her treatment and were entrusted to AHN on the understanding that they would be kept confidential.

174. Further, Plaintiffs and the class have suffered damage to and diminution of the value of their PII and PHI. Individual pieces of private information such as SSNs have an ascertainable monetary value, as evidenced by the prices cybercriminals charge for them.

175. As a healthcare provider, AHN breached its fiduciary duty to its patients by, among other things: (a) mismanaging its system and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (e) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; (g) failing to follow its on privacy policies and practices published to its patients; and (h) making an unauthorized and unjustified disclosure and release of Plaintiff and the Class members' PHI and medical records/information to a criminal third party.

176. AHN's breach of its fiduciary duty to its patients was a real factor in bringing about Plaintiffs' and Class Members' injuries. But for AHN's failure to properly secure its computer systems, Plaintiffs would not be required to spend time, money, and effort to protect themselves from imminent fraud.

177. In addition to AHN's duty to keep Plaintiffs' information confidential, AHN failed to safeguard PII and PHI that Plaintiffs had no choice but to provide to receive medical treatment. Plaintiffs and the Class were reliant on AHN for necessary services. The imbalance of power between Plaintiffs and Defendant AHN further indicates that AHN owed, and subsequently breached, a fiduciary duty to its patients.

178. As a direct and proximate result of AHN's breach of its fiduciary duty, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Pennsylvania and Massachusetts Classes Against Defendant AHN)**

179. Plaintiffs restate and reallege the allegations set forth in paragraphs 1–145 as if fully set forth herein.

180. Plaintiffs and Class Members entered into implied contracts with AHN when they obtained medical services from AHN or otherwise provided PII or PHI to AHN. Plaintiffs and Class Members were required to provide their PII and PHI to AHN as a condition of receiving medical treatment.

181. In doing so, Plaintiffs and Class Members entered into implied contracts with AHN by which AHN agreed to safeguard and protect their PII and PHI and keep such information secure and confidential.

182. When entering into these implied contracts, Plaintiffs and Class Members reasonably believed and expected that AHN's data security practices complied with its statutory and common law duties to adequately protect Plaintiffs' and Class Members' PII and PHI to timely notify them of a data breach. Plaintiffs and Class Members further reasonably believed and expected that AHN would use part of the monies paid to it under the implied contracts or the monies obtained from the benefits derived from the PII and PHI they provided to fund adequate and reasonable data security measures.

183. Plaintiffs and Class Members would not have provided their PII and PHI to AHN had they not relied on AHN representations that its systems are secure. The safeguarding of

Plaintiffs' and Class Members' PII and PHI was critical to the intent of the parties in entering into an agreement.

184. Plaintiffs and Class Members fully performed their obligations under their implied contracts with AHN.

185. AHN breached its implied contracts with Plaintiffs and Class Members by failing to protect their PII and PHI. Specifically, Defendants: (1) failed to take reasonable steps to secure its computer networks and systems to protect PII and PHI; and (2) disclosed Plaintiffs' and Class Members PII and PHI to unauthorized third parties, in violation of the agreement.

186. As a direct and proximate result of AHN's breach of implied contract, Plaintiffs and Class Members have been injured and are entitled to damages, including compensatory damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**
**BREACH OF CONTRACTS TO WHICH PLAINTIFFS AND CLASS MEMBERS WERE INTENDED THIRD PARTY BENEFICIARIES**
**(On Behalf of Plaintiffs and the Pennsylvania and Massachusetts Classes, Against Defendants AHN and IntraSystems)**

187. Plaintiffs restate and reallege the allegations set forth in paragraphs 1–145 as if fully set forth herein.

188. AHN had a contract with IntraSystems for it to provide information technology services. A principal purpose of that agreement was to securely store, transmit and safeguard the PHI and PII of Plaintiffs and class members.

189. Upon information and belief, both AHN and IntraSystems expressed an intention that Plaintiffs and class members were intended third party beneficiaries of that agreement.

190. Plaintiffs and class members are also intended third party beneficiaries of these agreements because recognizing them as such is appropriate to effectuate the intentions of the

parties, and the circumstances indicate that AHN and IntraSystems intended to give the beneficiaries the benefit of the promised performance.

191. Defendants breached its agreement with by allowing the data breach to occur, and as otherwise set forth herein.

192. Defendants' breach caused foreseeable and material damages to Plaintiffs and class members.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Classes, Against Defendants AHN and IntraSystems)**

193. Plaintiffs restate and reallege the allegations set forth in paragraphs 1–145 as if fully set forth herein.

194. This claim is alleged in the alternative to Plaintiffs' contract-based claims.

195. By their wrongful acts and omissions described herein, Defendants have obtained an undue benefit from the PII and PHI entrusted to them by Plaintiffs and Class Members.

196. Defendant AHN, prior to and at the time Plaintiffs and Class Members entrusted their PHI/PII and financial information to Defendant for the purpose of obtaining health services, caused Plaintiffs and Class Members to reasonably believe that AHN would keep such PHI/PII and financial information secure.

197. Defendant IntraSystems handled Plaintiffs' and the Classes' PII/PHI and received compensation from AHN on the understanding that IntraSystems would keep such PII/PHI secure.

198. AHN was aware, or should have been aware, that Plaintiffs and Class Members relied on its representations that the PHI/PII and financial information kept in its custody would be secure. Plaintiffs and Class Members would not have contracted with AHN, directly or

indirectly, had they known that both AHN and IntraSystems' information systems were sub-standard for that purpose.

199. Defendants also knew or should have known that if Plaintiffs and Class Members became aware of the substandard condition of and vulnerabilities in their information systems, Plaintiffs' and Class Members would be much less likely to seek their services.

200. Defendants failed to disclose facts pertaining to their substandard information systems before Plaintiffs and Class Members made their decisions to seek medical care. Instead, AHN suppressed and concealed such information for almost two months after the Data Breach occurred. By concealing and suppressing that information, AHN denied Plaintiffs and Class Members the ability to make informed decisions regarding their PHI and PII and received an undue benefit.

201. Defendants were unjustly enriched at the expense of Plaintiffs and Class Members. Defendants received profits, benefits, and compensation, in part, at the expense of Plaintiffs and Class Members. By contrast, Plaintiffs and Class Members did not receive the benefit of their bargain because they sought healthcare services on the assumption that their private information would be secure in Defendants' possession.

202. Since Defendants' profits, benefits, and other compensation were obtained by improper means, Defendants are not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

203. Plaintiffs and Class Members seek an Order of this Court requiring AHN and to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

**SIXTH CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Nationwide Class or, Alternatively, the Pennsylvania and Massachusetts Classes Against Defendants AHN and IntraSystems)**

204. Plaintiffs restate and reallege the allegations set forth in paragraphs 1–145 as if fully set forth herein.

205. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

206. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and PHI. Namely, whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches that compromise their PII and PHI. Plaintiffs allege that Defendants' data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

207. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

208. Defendants owed a legal duty to secure patients' PII and PHI under common law and Section 5 of the FTC Act; and

209. Defendants breached and continue to breach these legal duties by failing to employ reasonable measures to secure patients' PII and PHI.

210. This Court also should issue corresponding prospective injunctive relief requiring Defendants to employ adequate security protocols consistent with law and industry standards to protect Plaintiffs' and Class Members' PII and PHI.

211. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach of Defendants' systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendants' systems occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

212. The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendants if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendants of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendants have a pre-existing legal obligation to employ such measures.

213. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendants' systems, thus eliminating the additional injuries that would result to Plaintiffs, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representative of the Class and appointing Class Counsel;

B. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C. For compensatory damages on behalf of Plaintiffs and the Class;

D. For punitive damages on behalf of Plaintiffs and the Class;

E. For an order of restitution and all other forms of equitable monetary relief;

F. Declaratory and injunctive relief as described herein;

G. For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H. Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses;

I. Awarding pre- and post-judgment interest on any amounts awarded;

J. For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K. Awarding of such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: June 9, 2025

Respectfully submitted,

*/s/ Danielle L. Perry*
Danielle L. Perry (*Pro Hac Vice*)
**MASON LLP**
5335 Wisconsin Avenue, N.W. Suite 640
Washington, D.C. 20015
Telephone: (202) 640-1168
dperry@masonllp.com

*/s/ Andrew W. Ferich*
Andrew W. Ferich (PA Bar No. 313696)
**AHDOOT & WOLFSON PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087

Telephone: (310) 474-9111
aferich@ahdootwolfson.com

*/s/ Benjamin F. Johns*
Benjamin F. Johns (PA Bar No. 201373)
**SHUB JOHNS & HOLBROOK LLP**
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
bjohns@shublawyers.com

*/s/ Anasuya E. Shekhar*
Anasuya E. Shekhar (PA Bar No. 333531)
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
Telephone: (412) 322-9243
anasuya@lcllp.com

*Co-lead Counsel for Plaintiffs and the Proposed Class*

Charles E. Schaffer
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
cschaffer@lfsblaw.com

Nickolas J. Hagman
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Telephone: (312) 782-4880
nhagman@caffertyclobes.com

Gary Klinger*
**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel: 866-252-0878

gklinger@milberg.com

Anthony L. Parkhill
**BARNOW AND ASSOCIATES, P.C.**
Cook County Attorney No. 38957
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312-621-2000
aparkhill@barnowlaw.com

Marc Edelson*
**EDELSON LECHTZIN LLP**
411 S. State Street
Suite N-300
Newtown, PA 18940
Tel: 866-230-5595
medelson@edelson-law.com

*Plaintiffs' Steering Committee*

*admitted *pro hac vice*